**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INGHAM REGIONAL MEDICAL CENTER<br>401 West Greenlawn Avenue<br>Lansing, MI 48910,<br><br>BAY REGIONAL MEDICAL CENTER<br>1900 Columbus Avenue<br>Bay City, MI 48708,<br><br>McLAREN NORTHERN MICHIGAN<br>416 Connable Avenue<br>Petoskey, MI 49770,<br><br>GIFFORD MEDICAL CENTER, INC.<br>44 South Main Street<br>Randolph, VT 05060,<br><br>LAKEWOOD HEALTH SYSTEM<br>49725 County 83<br>Staples, MN 56479,<br><br>FOR THEMSELVES, AND ON BEHALF OF<br>1,700 HOSPITALS, AS A CLASS,<br><br>        Plaintiffs,<br><br>   v.<br><br>CHARLES TIMOTHY HAGEL, SECRETARY OF<br>THE UNITED STATES DEPARTMENT OF<br>DEFENSE,<br>In his official capacity<br>1600 Defense Pentagon<br>Washington, DC 20301-1600,<br><br>        Defendant. | Civil Action No. 1:13-cv-0417 |

**COMPLAINT**

COME NOW Plaintiffs, for themselves and as "Class Representatives" for the "Class" of approximately 1,700 similarly situated hospitals in the United States of America (more specifically defined below), and bring this class action, by and through undersigned counsel,

pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## I.PARTIES AND CLASS ALLEGATIONS

1.Plaintiffs, and would-be Class Representatives, are Ingham Regional Medical Center, a non-profit corporation operating a community hospital at 401 West Greenlawn Avenue, Lansing, Michigan; Bay Regional Medical Center, a non-profit corporation operating a community hospital at 1900 Columbus Avenue, Bay City, Michigan; McLaren Northern Michigan, a non-profit corporation operating a community hospital at 416 Connable Avenue, Petoskey, Michigan; Gifford Medical Center, Inc., a non-profit corporation operating a community hospital at 44 South Main Street, Randolph, Vermont; and Lakewood Health System, a non-profit corporation operating a community hospital at 49725 County 83, Staples, Minnesota.

2.The Class is defined as every hospital in the United States of America that: (1) provided outpatient services to individuals enrolled in the TRICARE program between August 1, 2003 and December 31, 2009, and (2) participated in Defendant's April 25, 2011 Discretionary Payment Process, defined below.  The Class is so numerous (estimated at 1,700 hospitals) that joinder of all the members is impracticable.  There are questions of law and fact common to the Class including: (1) the period of time during which Class members were harmed by the contractual breaches and errors of Defendant, and (2) the amount owed to Class members by Defendant.  Plaintiffs, as Class Representatives, will fairly and adequately protect the interests of the Class, their claims are typical of the claims of the Class, and they are represented by counsel experienced in class actions.

3.Defendant is Secretary of the United States Department of Defense in his official capacity as operator of TRICARE, a federal health care program for the Armed Services.

## II.     JURISDICTION AND VENUE

4. This is an action for breach of contract, mutual mistake, breach of the covenant of good faith and fair dealing, declaratory judgment, and for a stay pending mediation.

5. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims of Plaintiffs and the Class arise under federal statutes (including, but not limited to, the National Defense Authorization Act for Fiscal Year 2002, 10 U.S.C. § 1079(j)(2)) and regulations, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

6. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391, as the majority of the events giving rise to the claims made herein took place in this judicial district.

## III.    STATUTORY AND REGULATORY BACKGROUND

7. In 1956, Congress established a military health care system to "provid[e] an improved and uniform program of medical [and dental] care for members of the uniformed services and their dependents." *See* Dependents' Medical Care Act, Pub. L. No. 84-569, 70 Stat. 250; *see also* Pub. L. No. 85- 861, 72 Stat. 1445; 10 U.S.C. § 1071 et seq.  This law established, *inter alia*, a system for contracting basic health insurance, medical services or health plans for dependents of active duty service members and for the provision of basic medical services at military treatment facilities.  *See* 70 Stat. 250-54; *see also* 10 U.S.C. §§ 1074, 1076, 1079.  In 1966, Congress expanded this basic coverage to retirees, eligible dependents of retirees, and survivors.  *See* Pub. L. No. 89-614, 80 Stat. 862-66; see also 10 U.S.C. 1086(c).  The Secretary of Defense has sole authority to contract for the provision of medical and dental care outside of a military treatment facility.  *See* 10 U.S.C. § 1079(a).  Since 1995 this health program has been known as the TRICARE Program.

8. The United States Department of Defense ("DoD") has promulgated regulations and manuals that, together with the underlying statutes, govern all aspects of the TRICARE program. *See* 32 C.F.R. Part 199. The TRICARE Management Activity ("TMA") manages and administers the program. *See* 10 U.S.C. § 1072(7); DoD Directive 5136.12 (May 31, 2001).

9. Claims for medical benefits may be filed by institutional providers (e.g., hospitals) and non-institutional providers (e.g., physicians). *See* 32 C.F.R. § 199.6. Reimbursement payments to hospitals and physicians must be made in accordance with the laws and regulations governing the TRICARE Program. *See e.g.,* 10 U.S.C. § 1079(j)(2), 32 C.F.R. § 199.14.

10. The much larger Medicare system was regarded by Congress as a more efficient and effective benefit reimbursement system. Accordingly, Congress, via the National Defense Authorization Act for Fiscal Year 2002 ("Act"), directed TRICARE, "to the extent practicable" to reimburse institutional providers in accordance with Medicare payment rules. *See* 10 U.S.C. § 1079(j)(2). To implement this Act, TRICARE issued a final rule on October 24, 2005, *see* 70 Fed. Reg. 61368 (Oct. 24, 2005), explaining it was not practicable for TRICARE to fully adopt Medicare's hospital reimbursement methodology, and instead providing that the reimbursement amounts for ten specific categories of hospital outpatient services be subject to a fixed maximum allowable charge (referred to as "CMAC" for CHAMPUS Maximum Allowable Charge). 32 C.F.R. § 199.14(a)(5)(i)-(x).

11. TRICARE, unfortunately, made a major error in designing its revised reimbursement system. It failed to recognize that CMAC is the payment methodology used only in reimbursing "*individual* health care providers" (such as doctors) and *not* institutions, such as hospitals, which invariably have more overhead. 32 C.F.R. §199.14(j)(emphasis added). Indeed,

it is clear that CMAC was never intended to be the sole reimbursement hospitals received for providing hospital outpatient services. *See Sacred Heart Health System, Inc., et al. v. Humana Military Services, Inc*., No. 3:07-cv-62-MCR-EMT (N.D.Fla.), Nov 21, 2011 in which the Magistrate concluded that "[t]hus, the regulations contemplate CMAC rates as a provider reimbursement method for physicians *but not for hospitals*." Magistrate Report and Recommendation at 20 (emphasis added). The upshot was that using the revised TRICARE system produced a significant underpayment to hospitals providing benefits governed by the TRICARE system.

12. From 2003 to 2008, the hospitals made a substantial effort to advise TRICARE of this basic error, both orally and in writing. As large bureaucracies are wont to do, TRICARE stubbornly insisted CMAC was the appropriate reimbursement formula for hospitals.

13. Finally, in late 2008 the TRICARE bureaucracy acknowledged the error of using solely CMAC in their reimbursement system and offered a modified payment system for hospital outpatient services that was, as directed by Congress in 2002, similar to Medicare payment rules. *See* 73 Fed. Reg. 74945 (Dec. 10, 2008). However, between August 1, 2003 and December 31, 2009 Class members were substantially underpaid, and TRICARE's refusal to pay the money erroneously withheld from the hospitals during this six-year period became the genesis of this lawsuit.

## IV.   FACTUAL BACKGROUND

This litigation is not fact intensive. Indeed, the relevant facts are few in number and most, if not all, of them are beyond dispute. Thus, the discovery phase will be brief and narrowly targeted, and the case itself need not be protracted.

### A.     Claims for Hospital Outpatient Services Paid Incorrectly

14.     During the period between August 1, 2003 and December 31, 2009 (the "Relevant Time"), all claims for payment of outpatient hospital services rendered by the Class members were required to be submitted on, and pursuant to, a uniform claims form.

15.     During the Relevant Time all claims by Class members for payment of hospital outpatient services were submitted on the required forms but, as stated above, were paid incorrectly. Class members complained to TRICARE, demanding correct payment.

### B.     Defendant's Response to the Plaintiffs' Complaints: The "Study"

16.     Finally, as a result of the complaints, TRICARE directed that a study be undertaken of the accuracy of its payments to hospitals for outpatient services rendered during the Relevant Time (the "Study"). *See* Notice to Hospitals of Potential Adjustment to Past Payments for Outpatient Radiology Services ("Notice") attached as ***Exhibit A*** at 3-4. The Study was done by Kennell and Associates Inc. ("Kennell"), an independent consultant previously used by Defendant as an outside "subject matter expert."

17.     The Study purportedly compared the CMAC payments made to the hospitals for outpatient services, to the payments that *would have* been made using Medicare payment principles for the same services, and determined that Defendant (1) *underpaid* hospitals for outpatient radiology (one of the ten outpatient categories) but, (2) correctly paid hospitals for the other nine outpatient services: "In all cases, except radiology services, TRICARE payments for hospital outpatient services were either comparable to what Medicare would have paid or TRICARE paid more." *See* Notice attached as ***Exhibit A*** at 4.

18.     With respect to radiology, the Study purportedly compared the payments made by TRICARE to the hospitals, to the payments that would have been made using the "Medicare

6

blended rate." *See* Affidavit of Manie Campbell, attached as ***Exhibit B***. The adoption of the Medicare blended rate methodology acknowledged that an "additional payment," above CMAC, be made to compensate each hospital for overhead costs not captured by the CMAC payments. This "additional payment" equated to forty-two percent (42%) of the overhead costs incurred by hospitals in providing radiology services. *See* Notice attached as ***Exhibit A*** at 6. In sum, and as explained in more detail below, Defendant admitted that it owed each member of the Class an additional, to-be-calculated, payment.

19. Notwithstanding contentions to the contrary, reimbursement owed by TRICARE to a hospital is not a discretionary task left to TRICARE's sole judgment. TRICARE has a statutory obligation to pay hospitals/Class members in accordance with the law. *See e.g.*, 10 U.S.C. § 1079(j)(2).

    **C.    Defendant's Response to the "Study": The Discretionary Payment Process**

20. Class Counsel asked Defendant to acknowledge the problems raised by the need for the Study and to calculate monies owed Class members for all outpatient services. Defendant refused. Instead, Defendant unilaterally, and without notice to the hospitals, created and announced a discretionary process (the "Discretionary Payment Process"), which was communicated to the Class via an April 25, 2011 form letter ("April 25 Letter"), attached hereto as ***Exhibit C***. Defendant's April 25 Letter referenced a Notice describing the Discretionary Payment Process, how Defendant would entertain applicants, and the details of the steps that were to be followed to calculate the amount owed to a specific hospital, and the 60-day deadline in which to participate. (The April 25 Letter, Notice, and information posted by TRICARE on its website, collectively referred to herein as the "Communications"). This was presented to the hospitals on a take it or leave it basis. Plaintiffs were not consulted about any of this, and thus

7

had no meaningful input into a process which had substantial financial consequences to them. This is in sharp contrast to a typical rulemaking process, which is public and provides input for comment for those affected by a proposed rule—the manner by which government agencies typically conduct business.

21. Approximately 1,700 hospitals responded to the Communications and submitted the required information by the 60-day deadline because that was the only way they could ascertain TRICARE's assessment of the reimbursement owed them.  Unbeknownst to Plaintiffs, Defendant had assigned the 1,700 applications and the responsibility to undertake the calculations to Kennell (the same group that had done the Study).  It was Kennell's obligation to comply with the requirements of the Communications, apply the relevant data to the TRICARE adopted payment methodology, and correctly calculate the monies due each member of the Class.  Kennell undertook this task, and released the calculations to Defendant.  Defendant then notified Class members of the calculations and proposed payment.  Class members were told that if they accepted the proposed payment they were to sign a release in which they gave up their right to reimbursement for *all* outpatient services ("Release"), attached hereto as *Exhibit D*, and return it to Defendant and then payment would be sent to them.  Hospitals which chose not to participate would forfeit any claims to receive any reimbursements.

### D. The Discretionary Payment Process is Questioned

22. During this period of time, Class Counsel was retained by a large group of hospitals (the "300 Represented Hospitals") which received the Communications and elected to participate in TRICARE's Discretionary Payment Process, to determine what payments were due them. As with all Class members, they were required to, and did, provide TRICARE with a form containing information, from which TRICARE could calculate the payments due for radiology

services.  As stated above, TRICARE had Kennell calculate the proposed payments due each of the hospitals but TRICARE never informed the hospitals that it had delegated this responsibility to Kennell.  Kennell gave the final calculations to TRICARE, which then notified each hospital (1) that the calculations showed a payment was owed them, or (2) that the calculations showed *no* payment was owed them.

23. With respect to the 300 Represented Hospitals—upon receipt of the proposed payments offered each of their clients, Class Counsel contacted TRICARE complaining of errors in the calculations, pointing out the following, and other, mistakes: (a) claim information was incomplete (e.g., the data being used did not include all the claims for services actually rendered and billed by hospitals); and (b) certain categories of claims were systematically, and inappropriately, excluded (e.g., claims were wrongfully excluded based upon the services being deemed to have "other health insurance").  Class Counsel informed TRICARE that use of deficient data and erroneous calculations understated the amount owed the 300 Represented Hospitals for outpatient radiology services by about one hundred and twenty-nine percent (129%).  It was at this time that Class Counsel learned that Kennell had performed the calculations for TRICARE.

24. After numerous discussions, TRICARE acknowledged that Kennell had erroneously calculated the payments for outpatient radiology services pursuant to TRICARE's adopted processes and regulations, and that TRICARE was not aware of the errors before sending out notices to the participating hospitals advising them of either (1) the proposed payments due, or (2) that, pursuant to the calculations, no payments were due.  *Defendant then agreed to pay the 300 Represented Hospitals, on average, seventy-seven (77%) more than the erroneous figures provided by Kennell.*  See Affidavit of Manie Campbell attached as **Exhibit B**.

9

25. In sum, the 300 Represented Hospitals received a recalculated payment but the other members of the Class did not. The entire Class should have received payments for radiology services recalculated to reflect the errors committed by Kennell. However, TRICARE elected not to notify the members of the Class of the errors, resulting in each Class member remaining underpaid during the Relevant Time.

26. Shortly after TRICARE paid the 300 Represented Hospitals for underpayment of outpatient radiology services, Class Counsel contacted TRICARE (1) requesting that all Class members be paid correctly for radiology services and (2) advising TRICARE that Class Counsel believed the Study's conclusion that only outpatient radiology services had been underpaid could not be correct and that other outpatient services had been likewise underpaid.

27. Class Counsel then formally requested a copy of the Study believing that an independent analysis of the Study would prove that the Study's main conclusion—that *only* outpatient *radiology* services were underpaid—was incorrect.

28. In March 2013 TRICARE finally produced the Study, which included five enclosures.

29. Plaintiffs' experts analyzed the Study and enclosures and discovered:

    (a) With respect to radiology services, the statement in the Communications that the underpayment was $98 million is incorrect. The correct figure, as determined by Kennell, is $215.6 million;

    (b) With respect to *outpatient diagnostic services*, Kennell's calculations and data showing the difference between monies paid under TRICARE versus Medicare were incorrect;

    (c) With respect to *outpatient laboratory services*, Kennell's calculations and

                    data showing the difference between monies paid under TRICARE versus Medicare were incorrect; and,

(d)    With respect to *outpatient rehabilitation therapy services*, Kennell's calculations and data showing the difference between monies paid under TRICARE versus Medicare were incorrect.

In sum, the Class has been underpaid for (1) outpatient radiology,[1] (2) outpatient diagnostics, (3) outpatient laboratory and (4) outpatient rehabilitation therapy services for the Relevant Time.

## COUNT I
## BREACH OF CONTRACT

30.    Plaintiffs incorporate herein by reference the allegations set forth in Paragraphs 1 through 29 above as if fully set forth herein.

31.    The Class members responded to Defendant's April 25, 2011 Letter by submitting forms and data, thereby accepting Defendant's offer to participate in the Discretionary Payment Process. In return, Defendant stated that (1) the Study revealed that no monies were due for outpatient services except radiology and (2) Defendant would review the sufficiency of past radiology payments made to the hospitals, and determine, pursuant to Medicare's blended rate methodology, what, if any, additional payments were due.

32.    Defendant breached this agreement by (1) accepting as accurate the Study performed by Kennell, which contained incorrect analysis and assertions when comparing what TRICARE paid for radiology, diagnostic tests, laboratory services and rehabilitation therapy services to what Medicare would have paid, and (2) accepting as accurate the Class members' specific calculations performed by Kennell and providing those incorrect calculations to the

---

[1]    With respect to all references to outpatient radiology, the 300 Represented Hospitals have been paid in full.

11

Class.

33. As a direct and proximate result of Defendant's breach of contract, Class members were underpaid.

## COUNT II
## MUTUAL MISTAKE

34. Plaintiffs incorporate herein by reference the allegations set forth in Paragraphs 1 through 33 above as if fully set forth herein.

35. At the time Class members either accepted or rejected the incorrect payments offered by Defendant, each party believed (1) Defendant had correctly calculated the amounts due to each Class member pursuant to the methodology adopted by TRICARE in the Discretionary Payment Process and (2) Defendant had correctly determined that no additional amounts were due each Class member for diagnostic services, laboratory services and rehabilitation therapy services.

36. As subsequently discovered, this belief was mistaken, as Kennell had failed to correctly compute the calculations, as prescribed, for outpatient radiology, diagnostic, laboratory and rehabilitation therapy services for the Relevant Time.

37. The mutual mistakes of the parties were based upon a belief that the underlying Study and the calculations of monies owed were done *correctly* and these beliefs were an integral and basic assumption of the parties' participation in the Discretionary Payment Process.

38. The mutual mistakes had a material effect on the nature of the bargain between the parties, namely, the consideration offered Class members.

39. Neither the Class members' participation nor the Release (signed by some of the Class members) place the risk of the mistaken calculations on Plaintiffs.  The calculations were to be made by *Defendant* which in turn relied upon Kennell, which company made the errors.

12

40. As a direct result of these errors, both parties were mistaken, and Class members were incorrectly paid for these four outpatient services during the Relevant Time.

## COUNT III
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

41. Plaintiffs incorporate herein by reference the allegations set forth in Paragraphs 1 through 40 above as if fully set forth herein.

42. Under applicable law, there is a covenant of good faith and fair dealing implied in the parties' contract.

43. By failing to correct the errors identified in Kennell's Study and calculations of the amounts due each Class member, Defendant breached its covenant of good faith and fair dealing.

44. As a direct and proximate result of Defendant's conduct, the Class has suffered monetary loss.

## COUNT IV
## DECLARATORY JUDGMENT

45. Plaintiffs incorporate herein by reference the allegations set forth in Paragraphs 1 through 44 above as if fully set forth herein.

46. Pursuant to the Declaratory Judgment Act, 28 USC §§ 2201-2202, Plaintiffs pray the Court declare the rights and obligations of the parties, including a declaration that Defendant failed to pay Plaintiffs and the Class as required by law.

47. In so declaring the rights and obligations of the parties, Plaintiffs pray the Court further set out the legal relations between the parties such that justice may be served.

## COUNT IV
## STAY PENDING MEDIATION

48. Plaintiffs incorporate herein by reference the allegations set forth in Paragraphs 1

through 47 above as if fully set forth herein.

49. This class action involves three counts against Defendant for failure to pay the Class correctly. Resolution can be reached, without years of time consuming and expensive litigation, through mediation with a Court-appointed mediator or special master.

50. Accordingly, Plaintiffs ask the Court, in the exercise of its equitable powers, to stay this case for 30 days and appoint a mediator or special master to meet with the parties to settle the case.

## PRAYER FOR RELIEF

1. Judgment against Defendant and in favor of Plaintiffs and the Class for breach of contract sufficient to compensate the Class for the damages suffered;

2. Judgment against Defendant in favor of Plaintiffs and the Class on the grounds of mutual mistake such that the contract between the parties is reformed to reflect the correct amounts due each member of the Class for outpatient services during the Relevant Time;

3. Judgment against Defendant and in favor of Plaintiffs and the Class for breach of covenant of good faith and fair dealing sufficient to compensate the Class for the damages suffered;

4. Declare the rights and obligations of the parties;

5. Stay this action for 30 days and appoint a mediator or special master to allow the parties to work towards settlement; and,

6. Award Plaintiffs and the Class fees and costs pursuant to applicable law, and such other relief this Court deems just and proper.

Dated: April 1, 2013

Respectfully Submitted,

/s/ Alexander J. Pires, Jr.
Alexander J. Pires, Jr. (D.C. Bar # 185009)
Diane E. Cooley (D.C. Bar # 431817)
**PIRES COOLEY**
4401 Q Street, N.W.
Washington, D.C. 20007
Telephone: (202) 905-6706
Email: farmerslawyer@aol.com

Of Counsel:

/s/ Gregory A. Brodek
Gregory A. Brodek
**DUANE MORRIS LLP**
88 Hammond Street, Suite 500
Bangor, ME 04401-4953
Telephone: (207) 262-5400
Email: gabrodek@duanemorris.com

/s/ Benjamin G. Chew
Benjamin G. Chew (D.C. Bar #418577)
Anurag Varma (D.C. Bar #471615)
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
Telephone:  (202) 457-6000
E-mail:  bchew@pattonboggs.com
           avarma@patonboggs.com

/s/ Kenneth C. Anderson
Kenneth C. Anderson (D.C. Bar # 343962)
**LAW OFFICES OF KENNETH C. ANDERSON**
2809 Boston Street, #432
Baltimore  MD 21224
Telephone: (410) 342-2352
Email: k4ande@aol.com